## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

DAN FRIEDMAN

                Plaintiff,

           -against-                          Civil Action No.:

| | |
|---|---|
| STHREE PLC. | : |
| STHREE INC. | : |
| HUXLEY ASSOCIATES B.V. | : |
| HUXLEY ASSOCIATES LTD | : |
| HUXLEY ASSOCIATES INC. | : **COMPLAINT** |
| IVANA RADUJKO | : **(WITH JURY DEMAND)** |
| PALLADYNE INTERNATIONAL ASSET | : |
| MANAGEMENT B.V., | : |
| ISMAEL ABUDHER, | : |
| LILY YEO, | : |
| NIKOLAY TISCHCHENKO, | : |
| PIEDAD ALONSO GAMO, and | : |
| BILL STEVENS | : March 25, 2014 |

                    Defendants.

## COMPLAINT

### Introduction

1.    This action arises from an international financial fraud that is entering its 7th year. The plaintiff, a Connecticut financial services executive, was among its multiple victims. Its perpetrators were the international executive recruiting firm, defendant SThree Plc (and affiliates) and its client, defendant Palladyne International Asset Management B.V. ("Palladyne"), a kickback and money laundering operation for the former dictatorial Ghaddafi regime in Libya, operating under the public pretense of a hedge fund.

2.    Defendants SThree Plc. and SThree Inc., are parent entities to the Huxley companies (collectively "SThree Group"), consisting of 55 offices in 21 countries. Both

the SThree and Huxley companies present themselves to the public as "premier global recruiting firms." As will be proven at trial, they are primarily "resume brokerage" factories, offering little to their clients or their job candidates than the collection of resumes and the purveyance to candidates of whatever claims are needed to close a recruiting deal. Whether those claims are true or false is often lost in the rush for commissions.

3.      Contrary to its fabricated image as the "world's pioneering asset management firm," defendant Palladyne's primary purpose was and is the laundering and concealment of funds illicitly siphoned from the Libyan national patrimony.

4.      Defendant SThree collaborated and conspired with the Palladyne defendants to utilize fraudulent inducement, mail fraud, wire fraud and other deceptive practices to lure the plaintiff to employment in what turned out to be no more than a kickback, bribe and money laundering scheme designed to conceal funds diverted by the Ghaddafi family, defendant Abudher's extended family, and other prominent officials of the since-deposed Libyan regime.

**Parties**

5.      Plaintiff Dan Friedman ('plaintiff" or "Friedman") is an experienced financial services executive. His lifelong domicile is and has been Stamford, Connecticut, where he resides at 75 Ridge Brook Drive.

6.      Defendant SThree Plc. ("SThree UK") is a publicly traded executive recruitment specialist firm based in London, United Kingdom. Its headquarters are at 215-217 Portland Street, London, England.  It maintains 55 offices in 21 countries and operates as a unified, centrally managed "House of Brands," with operating companies in

multiple areas of the staffing and recruitment business. The company includes a number of subsidiaries that are directly managed by SThree UK, regardless of where they are geographically situated (collectively "SThree Group").

7.     SThree Group companies have over the years regularly solicited hundreds of companies and candidates in Connecticut, and regularly do business in Connecticut. As of the date of this Complaint it has 16 separate job listings in Connecticut for which it has been engaged to conduct candidate searches. Candidates for these positions are solicited from throughout the SThree Group worldwide companies, so a job in Connecticut can be searched by multiple SThree companies simultaneously, regardless of their location.

8.     SThree Group has targeted the United States as its principal growth market and regularly competes with local firms in Connecticut and elsewhere. In the first quarter of 2014 SThree's US operating profit grew year-to-year by 49%.

9.     Defendant SThree USA ("SThree USA") is a subsidiary of Specialist Staffing Solutions, Inc., a Delaware corporation, with offices in Boston, Chicago, Houston, New York, San Francisco, and San Diego. Its principal place of business for matters relating to this action is at 1270 Avenue of the Americas, 23rd Floor, New York, New York. Both SThree USA and Specialist Staffing Solutions are part of the SThree Group.

10.     Defendant Huxley Limited ("Huxley UK"), part of the SThree Group, is a subsidiary of SThree UK and has a principal place of business at 41-44 Great Windmill Street, London, England.

11.     Defendant Huxley Associates, part of the SThree Group and a division of

Specialist Staffing Solutions, Inc., is a US-based recruiting firm with a principal place of business is at 1270 Avenue of the Americas, 23rd Floor, New York, New York.

12.     Defendant Huxley Associates, part of the SThree Group, is a division of SThree Holdings B.V (Netherlands). It is a multinational recruiting firm and a subsidiary of SThree UK, with a principal place of business for matters relating to this case at Singel 540, Amsterdam, The Netherlands.

13.     Defendant Ivana Radujko is an executive recruiter with defendant Huxley Associates (Netherlands) with her principal place of business at Singel 540, Amsterdam, The Netherlands. (Defendants Radujko, SThree UK, SThree US, Huxley UK, Huxley US and Huxley Associates are collectively referred to below as "SThree Group" or "SThree defendants").

14.     Defendant Palladyne International Asset Management BV ("Palladyne" or "PIAM") is a corporation organized under the laws of the Netherlands. Its headquarters and principal place of business are located at Gustav Mahlerplein 70, 1082 MA, Amsterdam, The Netherlands.

15.     Defendant Ismael Abudher is the chief executive officer of Palladyne. His principal place of business is the headquarters of Palladyne in Amsterdam, The Netherlands.

16.     Defendant Lily Yeo is the Chief Strategy and Business Development Officer of defendant Palladyne. Her principal place of business is the headquarters of Palladyne in Amsterdam, The Netherlands.

17.     Defendant Nikolay Tishchenko is the Chief Research and Development Officer of defendant Palladyne. His principal place of business is the Palladyne

4

headquarters in Amsterdam, The Netherlands.

18.     Defendant Piedad Alonso Gamo is the Human Resources Manager at Palladyne. Her principal place of business is at Palladyne headquarters in Amsterdam, The Netherlands.

19.     Defendant Bill a/k/a "Billie" Stevens is the Head of Compliance at Palladyne. His principal place of business is at Palladyne headquarters in Amsterdam, The Netherlands.  In normal investment management firms and banks, the Head of Compliance is charged with assuring compliance with all government regulatory rules. In the European Union, those responsibilities include conforming to the multiple EU directives under the Markets in Financial Instruments Directive ("MCID"), which includes Anti Money Laundering requirements, as well as anti-bribery and other anti-corruption policies. (Defendants Palladyne International Asset Management, Abudher, Yeo, Tischenko, Alonso Gamo and Stevens are collectively referred to below as "Palladyne defendants").

## Jurisdiction and Venue

20.     This Court has subject matter jurisdiction of this action pursuant to 28 U. S. C. § 1331 because of the diversity of citizenship of the parties and because the plaintiff's damages exceed $75,000.

21.     This Court also has jurisdiction because one of the claims raises a federal question under 18 U.S.C. sec. 1964, the Racketeering Influenced and Corrupt Organization Act ("RICO").

22.     The plaintiffs also seek a declaration of their rights pursuant to 28 U.S.C. § 2201(a) and this court has pendent jurisdiction over the other claims of the plaintiffs

that arise from state laws, the common law and, as will be proven under FRCP Rule 44.1, certain laws of The Netherlands and the United Kingdom.

23.     This court has general personal jurisdiction over the SThree defendants and specific personal jurisdiction over all defendants because the actions in question had as their principal purpose to defraud a Connecticut citizen, and the hundreds of acts identified in this Complaint were specifically and repeatedly directed into Connecticut with the intent to have impact and cause damage in this State.

24.     Venue is properly vested in this District pursuant to 28 U.S.C. secs. 1391(a) and 1391(c).

## Background

25.     The plaintiff is an experienced financial services executive with more than 15 years in increasingly responsible positions in his areas of expertise.

### The SThree Companies

26.     SThree Group is a large, publicly traded recruitment agency operating in both the part-time "contract" staffing area and full time executive recruitment field.

27.     Through its multiple "brands," SThree Group conducts its global activities through multiple wholly owned affiliates whose operations, policies and compensation are directed by the parent company.

28.     SThree UK, the parent, has many subsidiaries, all of which are part of the SThree Group and, regardless of their geographical location or legal structure, are centrally governed in a "flat" management structure directed by executives in London. Through multiple committees, including those governing Executive and Remuneration, all member companies in the SThree Group have compensation structures and

management guidelines imposed by the parent company that control worldwide operations. Local affiliates such as Huxley US, Huxley UK and Huxley Associates in the Netherlands are directly accountable to senior management in London.

29.     SThree UK reports earnings of its affiliates and subsidiaries on a fully consolidated basis and exercises direct operational and financial control over all of its operating units, including defendants SThree USA, Huxley Associates (Netherlands), Huxley UK and Huxley Associates (US).

30.     SThree UK's foreign operating units have separate entity structures solely to conform to local law. In all respects, the SThree Group is a fully integrated, centrally managed company.

31.     In 2005 Friedman submitted his resume to Huxley US in connection with certain employment opportunities advertised by the firm, for which Friedman's credentials and experience were relevant. Huxley had previously contacted Friedman and solicited information about his background.

32.     From 2005 through 2011 the US and foreign Huxley companies proposed more than 70 different US-based employment opportunities to Friedman.

33.     After multiple communications with recruiters in the more than four Huxley offices that approached him on those more than six dozen occasions, it appeared that there was no current "fit" for those positions that seemed most proximate to Friedman's background and interests.

34.     Huxley prides itself as a fully integrated international recruiting firm. In marketing itself to clients to engage its search services, Huxley aggressively promotes the fact that it maintains an integrated worldwide database of resumes that can be accessed

from any of its 21 worldwide offices. As its CEO, Gary Elden, recently boasted to the *Financial Times*, "[w]e are up against local recruitment agencies who only have local candidates, whereas we have access to a global database."

### SThree's Solicitations in Behalf of Palladyne

35.     Because Huxley's resume database is disseminated throughout the SThree Group global network, in September, 2010 the plaintiff received an unsolicited email at his Connecticut residence from defendant Ivana Radujko of Huxley's Amsterdam office.

36.     In that email she proposed a position in Amsterdam with an unidentified company that involved "…client reporting, client presentations and client portfolio where you shall be reviewing, analysing and carrying out attribution analysis for the client and optimising the client portfolio."

37.     Less than a month later Radujko sent another email to Friedman, describing  once again what seemed to be a similar Amsterdam-based position. Although Friedman expressed tentative interest each time, Radujko did not follow up on either solicitation.

38.      In or about February of 2011 the plaintiff received a third unsolicited email at his Connecticut residence from defendant Radujko.

39.     In the February solicitation Radujko stated that she had a client that was looking for an "experienced professional in providing investment solutions in various asset classes" and invited Friedman to provide an updated resume, which he did.

40.     The term "various asset classes" has a specific meaning in the financial services industry – it means (when true) that the company manages a broad range of investments that includes equities, bonds, currencies, and commodities.

8

41.     A company managing funds and investing in "various asset classes" further implies an organization with highly sophisticated investment and trading software systems, essential broker/dealer relationships, credit lines for trading, a serious regulatory compliance unit and a highly trained staff.

42.     Radujko followed up with further information about the position, advising Friedman that her client provided "full investment solution[s] to their clients, with a strong R&D desk that develops their models in house and follow [sic] the Man and Machine [sic] concept."

43.     The representations made by Radujko relating to her client were pursuant to instructions obtained from the Palladyne defendants. She was passing along information provided by them with the intent that public authorities, potential clients and potential employees rely on said information as if it were true.

44.     In fact, as noted below, Radujko knew that numerous material claims in the job description as well as her client description were false, including the fundamental misrepresentation that Palladyne had an "Investment Management Department." Had she truthfully disclosed the absence of the latter, it would have been a major red flag that something was amiss -- to Friedman or any other legitimate financial services professional.

45.     Radujko's client was, as Friedman later learned, the defendant Palladyne International Asset Management. As he also subsequently learned, Radujko had been working closely with Palladyne and had spent a great deal of time at Palladyne's offices and placed previous executives there – experience sufficient to have learned the true nature of Palladyne's operations.

46.     According to the Huxley website, upon which plaintiff Friedman reasonably relied, Huxley is "a trusted brand with a global reach."

47.     Huxley further represents to both its clients and those whom it recruits that its "… dedicated resourcing and research team includes top tier graduates, all of whom possess up-to-date business intelligence, market knowledge and industry expertise."

48.     Radujko told Friedman that she had represented Palladyne on previous hires that had worked out well, and that she had conducted her own threshold due diligence on the company, having spent over three hours at their offices meeting with top executives before taking on Palladyne as a client in 2010.

49.     As more fully described below, Friedman later learned that her claims were false and had the purpose and intent of concealing the very serious reasons that were making it impossible for Palladyne to retain legitimate financial services professionals.

### The Palladyne Fiction

50.     On or about February 28, 2011 Friedman asked Radujko for more information. Her reply was a referral to Palladyne's website at www.palladyne.com. A copy of the version of the website at that time is attached hereto as Exhibit "A."

51.     Radujko referred Friedman to the Palladyne website because she had agreed with Palladyne that she, SThree, and Huxley would present the site and its contents to job candidates as if it were a truthful, factual representation of Palladyne's overall business.

52.     Radujko knew that multiple elements in the website were false because some of her placements at Palladyne had left and told her so,  some having complained

bitterly to her about having been misled.

53.     As an experienced investment professional, Friedman could interpret the meaning of information from a company's website – assuming that it was true --  and he examined Palladyne's to better understand the nature and contours of its business.

54.     As of February, 2011, Palladyne's website contained the following material representations to potential employees and clients about its business, asserting that:

    (a)     Palladyne had a "worldwide client base;"

    (b)     Palladyne had delivered "consistent, optimized returns for [its] clients;"

    (b)     Palladyne utilized an investment decision and review approach that utilized "robust risk control;"

    (c)     Palladyne's investment process utilized "a sophisticated, structured, and disciplined process;"

    (d)     Palladyne was the "world's pioneering asset management firm;"

    (e)     Palladyne's "worldwide client base" encompassed a "wide variety of clients" that "rang[ed] from government institutions, pension funds, trusts and foundations to high net worth individuals."

    (f)     Palladyne utilized a "Man and Machine concept (sic), a highly structured and objective investment process, where rigorous fundamental analysis is being combined with state of the art statistical methods and technologies; " and

    (g)     that Palladyne's "Research and Development team continuously refine[s] the factors per asset class, to improve data collection and data quality.

The factors and associated weights are regularly challenged and updated per asset class."

55.     In reliance on Huxley's assurances through Radujko that the Palladyne website was an accurate representation of its client's business, Friedman authorized Radujko to indicate to Palladyne that he was interested in the company. He requested more detail about the open position.

**SThree and Palladyne Induce Friedman With Multiple, Detailed and False Claims of Palladyne Prowess and Sophistication**

56.     On or about March 1, 2011, Radujko transmitted a detailed five-page job description to Friedman at his residence in Connecticut.  A copy of that job description is attached hereto as Exhibit "B."

57.     The job described in Exhibit B was for a Deputy Chief Investment Officer, the second highest position in the Investment Management Department. The latter was described as "…the key function of Palladyne International Asset Management responsible for the client risk managed portfolio framework and optimal and trade execution portfolio investments, managing the execution of Palladyne funds for various asset classes."

58.     The problem with the job description – known to Radujko but concealed from Friedman – was that Palladyne had no "Investment Management Department," and that the so-called Deputy Chief Investment Officer was a phantom position.  The "deputy" had no "chief" to whom he or she could report.

59.     Radujko, who purports to specialize in the financial services industry in the branch of SThree Group that focuses on that market sector, knew that the job description she sent to Friedman would lead any reasonable investment professional to

believe that Palladyne was a state-of-the-art provider of a diverse array of products and services, even though she knew that was false.

60.     Radujko sent the website link and job description to Friedman for that purpose and to cause him to be more interested in the position for which her company would receive a commission, and from which she would be personally enriched.

61.     The compensation of recruiters such as Radujko depends heavily on procuring employees for SThree Group clients that earn commissions for SThree.

62.     SThree's compensation structure places a high premium on securing commissions from candidate placements, and the value of its publicly traded securities is heavily influenced by its commission revenues each year.

63.     The compensation of SThree Group executives is a mix of salary, bonuses and stock, and all of those components are heavily influenced by the commission generation performance of the SThree units.

64.     A central component of the SThree Group incentive system is "targets." As SThree tells people contemplating careers with the company, "[t]argets are a big part of our culture."

65.     SThree Group employees are motivated by "targets" in a manner similar to stock brokerages that promote "pump and dump" tactics to increase sales. The potential misuse of improper sales tactics is therefore a risk built into the SThree compensation system.

66.     In the SThree Group, sales persons such as Radujko are lured by incentives that include "win[ing] and dining in top restaurants in the company of SThree glitterati," "All expenses paid Super Trips (sic)," "All-expenses paid luxury long-

weekend breaks," "company [cars] and luxury car loans," elaborate parties in London with go-go dancers and extravagant entertainment, and other incentives, the most important one being the direct correlation between commission-based compensation and the successful placement of executives such as Friedman.

67.     Based on Friedman's review of (a) the Palladyne claims about itself in its website (Exhibit A) and (b) the substance of the job description forwarded by Radujko (Exhibit B), Friedman advised Radujko that he was interested in the Palladyne opportunity.

68.     At the same time that Friedman was considering the position with Palladyne, he was also pursuing two other positions: as Chief Operating Officer, Equities, Americas with a major international investment bank, and an executive level money management position with one of the world's largest investment managers, so his pursuit of the Palladyne opportunity was simultaneously in tandem -- and in competition with -- with those US-based opportunities.

69.     Radujko and Palladyne were aware that Friedman was considering the other options and that unless they could further entice him, they might lose him to the competition.

70.     In the ensuing months Radujko and Friedman had over 200 telephone conversations, email exchanges, text messages and a lengthy dinner meeting.

71.      In one early conversation on March 1, Radujko elaborated on her experience with Palladyne, describing them as "exceptional business managers," speaking of the firm's "sophistication," the talent of the "team" at the company and how Palladyne was growing very rapidly in both its client base and assets under management.

72.     Based on Radujko's representations to him about the time she had spent conducting due diligence on Palladyne and her experience with other (as she claimed) successful placements there, Friedman relied on her affirmative claims about Palladyne and was led by her to believe that they were both truthful and based on Radujko's direct knowledge.

73.     On March 2 Friedman followed up with inquiries about the number of employees, assets under management, the number of offices, executive turnover, management backgrounds, the timeframe for filling the position and the number of candidates being considered.

74.     After an array of further phone conversations and email exchanges, on April 2nd Friedman was contacted again at his Connecticut residence by Radujko, who advised that Palladyne had a favorable response to his credentials and that they would like to arrange a video conference call with defendants Lily Yeo (a Palladyne executive) and Ismael Abudher (the founder and chief executive officer of Palladyne.

75.     Radujko instructed Friedman that he should go to Huxley's New York office for the call.

76.     In preparation for the call Radujko told Friedman that she knew Abudher and Yeo well, that they were highly experienced investors and "very smart managers." She also reiterated and assured Friedman that Palladyne had a sophisticated and diversified client base.

77.     Lars Gloessner of Huxley's New York office and defendant Radujko coordinated with Friedman to arrange the videoconference.

78.     The conference took place on April 13 between Friedman (at Huxley's

15

New York office) and the Palladyne representatives (in Amsterdam).

79.     During the video conference, Abudher and Yeo proceeded to make the materially false misrepresentation that they had a worldwide institutional clientele and that the majority of the assets under management emanated from "Middle Eastern sovereign funds." The latter are state-owned and managed funds that, in the Middle East, are funded by petroleum revenues. Middle Eastern countries with such funds include Saudi Arabia, Qatar, Bahrain, Dubai and Abu Dhabi.

80.     The April videoconference was – it seemed at the time – productive, and led to extensive further communications, directly and through Radujko.

81.     On May 5 Radujko called Friedman to report that Abudher and Yeo were impressed with him. She assured Friedman once again that the two were first rate managers, that Palladyne offered a sophisticated and collegial work environment and that it attracted funds from a sophisticated international institutional clientele of a quality similar to those whose funds he had managed in his prior work with major Wall Street banks.

82.     In the same call they discussed what role at Palladyne might be most suitable for Friedman.

83.     On June 10 Friedman advised Radujko that the two competing opportunities in the U.S. that he was seriously considering were moving into more advanced discussions.

84.     Shortly thereafter, Radujko contacted Friedman seeking assurances that he was still interested in Palladyne.

85.     When Friedman gave her a summary description of his other stateside

options, she assured him that Palladyne was an excellent growth opportunity with first class senior management, significant upside compensation potential, a sophisticated clientele and with prospects of overall compensation that would be highly competitive with New York investment banks such as Goldman Sachs and Morgan Stanley.

86.     As she had previously, Radujko assured Friedman that Palladyne would enhance his career opportunities and that, based on her experience in executive recruitment in the financial services industry, Palladyne would open doors to other highly lucrative opportunities in Europe and the United States if and when he chose to move on.

87.     On June 17, 2011 a second Palladyne conference call took place, in which the participants were Friedman in Connecticut and defendants Yeo, Abudher, Piedad Alonso, Nicholas Tishchenko, as well as "Billie" Stephens, the Head of Compliance.

**Palladyne Invites Friedman to Amsterdam**

88.     The defendants were favorably impressed both by Friedman's background and the substance of their dual lengthy conference calls with him, and invited Friedman to come to Amsterdam for extensive, lengthy panel-style interviews.

89.     In early July, 2011 Friedman flew to Amsterdam and spent in excess of 18 hours in meetings and interviews over a three day period.

90.     During those meetings with defendants Abudher, Yeo, Stevens, Tischenko, Alonso and numerous other persons held out to be officers and managers, the defendants reiterated the specific prior claims they had made about the company, consistent with the portrait of the company presented in the Palladyne website.

91.     Those claims related to their client base and diversity, client origin geography, investment approach, breadth and quantity of asset classes under

management, investment track record, in-house resources and the numerous other affirmative representations made to Friedman during the preceding months.

92.     One area of particular interest during the Amsterdam meetings (and subject to focused discussion) was whether Palladyne was handling alternative investments (commonly known as hedge funds) in-house or through external investment managers.

93.     Defendant Abudher told Friedman (as had Radujko)  that all Palladyne investments -- including alternative investments -- were handled in house.

94.     Prior to Friedman's departure for the Amsterdam interviews, Radujko had suggested that they get together in Amsterdam after Friedman completed his first day of interviews.

95.     As a result, on July 7 Friedman and Radujko met at the Park Hotel in Amsterdam and proceeded for dinner to the Sucre Restaurant across the street.

96.     During a dinner conversation that lasted three hours, Radujko asked Friedman for his impressions of his interviews. She said that she had had a similar experience with Palladyne the year before when, in seeking to be retained as their primary recruiter, she had a half day of extensive panel meetings with multiple Palladyne executives.

97.     During the dinner Radujko reiterated her previous enthusiastic claims about Palladyne:

(a)     that it had first rate management talent;

(b)      that she had personally placed a number of its top managers and could vouch for them;

(c)      that the company offered exceptional personal and financial and career growth potential for Friedman;

(d)      that the company had a sophisticated, widely diversified client base that was growing rapidly;

(e)      that she had become personally familiar with the company through her other executive placements with them;

(f)      that morale in the company was high and that her placements liked working with Yeo and Abudher; and

(g)      that the company was turning in excellent results for its clients and that its performance was attracting new clients.

### The Offer, the Negotiations and the Contract

98.      Shortly after the Amsterdam meetings defendant Piedad Alonso telephoned Friedman at his Connecticut residence and requested that he send his starting compensation requirements.

99.      Friedman provided the requested information and stated his starting year compensation requirements, which were standard for the type of responsibilities Palladyne wanted him to undertake, and typical for the type of company Palladyne pretended to be and the peer group of major Wall Street banks which it claimed to be the benchmarks for its compensation system.

100.      Prior to asking for his compensation requirements defendants Yeo, Alonso and Radujko told Friedman that Palladyne considered itself to be in the same status position as prestigious American firms such as BlackRock, Goldman Sachs and Morgan Stanley. They also asserted that Palladyne structured its compensation program to be

directly competitive with that elevated category of companies.

101.    On July 19, 2011 Alonso sent Friedman an email extending an offer of employment that excluded terms or details, which would be forthcoming.

102.    Alonso also sent Friedman an offer letter via email on August 1.

103.    On August 9th Friedman had a phone conversation with defendants Abudher, Yeo, and Alonso during which he was presented with a revised offer. Friedman verbally accepted the offer subject to conditions he specified.

104.    On August 10 Palladyne sent a proposed contract that included a five-page job description. The latter indicated to Friedman, as an experienced investment professional, that Palladyne's requirements were for someone to manage risk at a company with the client base, assets under management, diversity of products and services, and sophistication presented in the Palladyne website and described to him by Radujko.

**The Offer and Palladyne's Duplicitous Due Diligence Replies**

105.    Friedman signed the offer letter but advised Alonso that his acceptance was conditioned upon (a) contract term agreement/execution and (b) Palladyne's satisfactory response to the due-diligence questionnaire he had presented.

106.    On August 17 Friedman, defendants Abudher, Yeo and Alonso had a one-hour conference call during which the defendants replied to Friedman's due diligence inquiries.

107.    Friedman's due diligence encompassed an array of questions and metrics material to determining Palladyne's substance and quality, among them:

      (a)      assets under management (referred to in the trade as "AUM");

      (b)      the ownership and management of the company;

material changes in management structure, and turnover in recent years (executive and staff stability);

      (c)      the percentage of AUM emanating from the largest clients;

      (d)      conflicts of interest (financial and personal) in the executive suite; and

      (e)      the five year performance history for each of the firm's principal investment strategies;

108.    Unbeknownst to Friedman, Palladyne's replies were bogus. The responses falsely portrayed a company similar to that described on the fictional website, falsely represented an array of "investment results" in various asset classes that was a fictional fabrication, misrepresented the nature and breadth of their client base (omitting any reference to the predominant base of funds out of Libya and linked to Ghaddafi) and made false representations about a large clientele of so-called Middle Eastern sovereign funds that was nonexistent.

**The Parties Reach a Deal and Friedman Moves to Amsterdam**

109.    After the August conference Yeo suggested that Friedman move immediately to Amsterdam and that they deal with the contract details and execution after his arrival.

110.    Friedman declined to move or to end his pursuit of his other US-based employment opportunities until he had a completed Palladyne contract.

111.    Several months of back-and-forth ensued over details of the contract,

focused primarily on Palladyne's repeated and emphatic concern over protecting the secrecy of its internal affairs and restricting Friedman from contacting any of Palladyne's clients, or even its non-client "business contacts."

112.    During all of those discussions, defendants Yeo and Alonso repeatedly emphasized that the preponderance of their client base was "Middle Eastern sovereign funds."

113.    It was, defendant Yeo said, for those reasons that Palladyne was particularly sensitive to not only protect the identities and relationships with clients, but also its relationships with so-called "partners" that were, in effect, no more than the business equivalent of acquaintances.

114.    No mention was made of Libya, the Ghaddafi connection or of Palladyne's heavy dependence on its illicit activities relating to Libya.

115.    After much back and forth focused on confidentiality and non-compete clauses, job title and other smaller details, an agreement was reached and Friedman arrived in Amsterdam on November 26, 2011.

116.    Upon Friedman's hiring and his subsequent successful passage through a two month "probation" period, SThree had vested the right to receive a substantial fee for recruiting Friedman to Palladyne.

## Emergence of the Fraud

117.    In the weeks following his arrival in Amsterdam Friedman gradually discovered a stunning, disturbing array of facts about Palladyne.

118.    The thrust of the revelations – discreetly volunteered by Palladyne employees (including multiple disgruntled executives who were planning to leave the

company – including defendant Tischenko and another Palladyne executive (Pablo Perez-Fernandez) -- was that Palladyne was the asset management company equivalent of a Potemkin Village, fronting for a kickback and money laundering scheme relating to funds out of Libya – not the Middle East,.

119.    Simply stated, Palladyne was a fraud.

120.    It was nothing more than a façade created to conceal criminal transactions funded by Libyan patrimony and funds funneled to Palladyne at the behest of defendant Abudher's father-in-law, Shukri Ghanem who, as head of the Libyan National Oil Company, had total control over the source of all of Libya's investment funds.

121.    Palladyne's primary function had nothing to do with the fictional company portrayed to the public (and to Friedman) through its website.

122.    Palladyne's real purposes were to (a) launder money defalcated from Libyan government oil revenues by the family and friends of Muammar Ghaddafi, the dictator who was eventually deposed and killed in 2011; (b) to serve as a recipient and guardian of bribes and kickbacks from companies doing business with the Ghaddafi regime (or hoping to do business with them) or the state oil company run by Abudher's father-in-law; and (c) to launder and protect money belonging to the family and friends of Palladyne's CEO, defendant Abudher.

123.    In stark contrast with the sophisticated and "diversified investment company" portrayed to Friedman by SThree Group, Palladyne and the named defendants (and disseminated to over one hundred other SThree recruits in the United States and Europe and to the public through Palladyne's website) the truth about Palladyne was startling:

23

    (a)    Palladyne did not have (as Abudher and Yeo had claimed to him on August 17 and as Radujko had "confirmed") $1,000,000,000 under management and another $8,000,000,000 in advisory assets; in fact it had $700,000,000 under management (to the extent that anything was being managed at all), none of which emanated from arms-length "institutional investors and pension funds" vaunted in its website, and all of which came from the Libyan Investment Authority, the Libyan African Portfolio and the Libyan Foreign Bank – each under the influence of Abudher's father-in-law. Ghaddafi's previous Prime Minister and the then-head of the Libyan National Oil Company (the source of literally all of the LIA's $55,000,000,000 in funds to invest).

    (b)    Palladyne did not have clients "around the world" nor did it have a client base of "Middle Eastern sovereign funds," nor did it have arms-length institutional investors, as Friedman had been told repeatedly by defendants Abudher, Yeo and Alonso;

    (c)    In fact, nearly all of Palladyne's Assets Under Management ("AUM") were of Libyan origin (i.e. the North African region known as the Maghreb, not the Middle East);

    (d)    Because nearly all of Palladyne's funds came from the Ghaddafi regime, when Friedman arrived in Amsterdam the preponderance of Palladyne's accounts weren't being traded at all – they had been frozen by the order of the United States government and the European Union (and Palladyne's securities custodian, State Street Bank), which were engaged in a *de facto* war with the Ghaddafi regime (which was itself engaged in a civil war);

(e)     Friedman discovered that State Street Bank (Boston), the world's leading securities custodian, had frozen Palladyne's accounts, and that Abudher was frantically trying to compel State Street via legal actions to unfreeze Palladyne's assets for the apparent purpose of evading the sanctions;

(f)     As a result, there were no funds to invest and no "risk" to "manage." In short, the "job" described to Friedman by Radujko did not exist;

(g)     In truth, as Friedman learned -- and contrary to what SThree Group had told him -- Palladyne did not have the infrastructure for managing more than a few clients even before the freeze on Libyan funds, and neither defendant Abudher nor defendant Yeo (whose previous experience was confined to marketing for a wireless phone company) had a background sufficient to oversee the operations Palladyne pretended to be capable of executing;

(h)     The funds held by Palladyne were not entrusted to the firm as the result of a distinguished investment track record, or because of the talents of its exceedingly limited (and largely decimated) executive ranks; in fact, the funds, Friedman was told, emanated from Abudher's family connections in Libya, in particular through his father in law, Shukri Ghanem, the aforementioned close aide and confidant of Ghaddafi;

(i)     On information and belief, Palladyne did not even have to compete for the Libyan funds or make a presentation to the Libyan state funds of its investment prowess, ideas or its (non-existent) investment track record. The funds sent to Palladyne in December, 2007 were the result of no more than an instruction from Ghanem;

(j)       With the Ghaddafi regime under siege, the funds managed by Palladyne were in jeopardy. Further, Abudher's father-in law Ghanem --- the primary source of the connections needed to ensure the flow of Libyan funds to be laundered by Palladyne – had fled Libya and was later found dead in April, 2012, floating in the Danube River in Vienna;

(k)       At the time of Ghanem's death he was under investigation for corruption by the new Libyan government. An Interpol Red Notice (a warrant equivalent) for his arrest stated that Ghanem was wanted for "fraud of public money...causing intentional damage to public money… interfering in incomes ... making illegal gains and abuse of power;"

(l)       Even if Abudher's family connection had not been in jeopardy prior to Friedman's arrival, Palladyne was at risk of losing the majority of its funds under management because of rank incompetence and fee gouging (Palladyne, according to an audit by the international consulting form KPMG's London office, was charging ranging from 2.5% to in excess of 3.8% on $250,000,000 of *uninvested cash* as well as on over $450,000,000 of frozen -- and therefore *unmanaged* – securities; in contrast, the industry standard fee for the services Palladyne pretended to perform averaged 0.10 to 0.55%;

(m)       The charging of fees from 6 to 38 times greater than market rates – particularly by an asset manager with little to no serious experience or track record – was and is a classic symptom of kickbacks. This was alarming to Friedman;

(n)       The Libyan Investment Authority (the source of nearly half of

Palladyne's funds) reported, based on the KPMG audit, that Palladyne's performance was so poor that it recommended that Palladyne be dropped; and

(o)     Palladyne's funds had been frozen nearly a year earlier, and consequently there had been no trading activity for over 10 months; the firm was prohibited from trading in the accounts it purported (and charged fees) to manage, was blocked from participation in the investment markets, and therefore no "investment management" taking place – on behalf of any client.

124.     Palladyne lacked both the management competence and the infrastructure to manage money: it did not (and lacked the capability to) monitor daily profit and loss or daily risk, and had no capacity to do so within a reasonable timeframe; it also lacked the experienced R&D staff that had been vividly – and falsely -- described by defendant Radujko.

125.     In effect, Palladyne was oblivious to the day-to-day impact of market fluctuations on the value of the investments held in its client portfolios.

126.     Palladyne was not managing risk. It was blindly guessing -- and not doing it very well.

127.     Palladyne employees had repeatedly alerted defendant Abudher to the existence of critical programming errors in the so-called "trading model" that rendered its stock-selection random and spurious.

128.     Palladyne was also at risk – and therefore its employees incurred serious reputational risk – because it had failed to register with the Netherlands Authority for Financial Markets ("AFM"), the Dutch Equivalent of the U.S. Securities and Exchange Commission ("SEC").

27

129.     Notwithstanding these frauds, Abudher never candidly told his investors that their investment portfolios were being randomly constructed. Furthermore, Abudher repeatedly misrepresented to clients and the candidate employees solicited by SThree that the reason PIAM held over $250,000,000 in cash was that the so-called "investment model" had generated a "signal" instructing him to do so.

130.     In fact, the model had no such capability. Palladyne was just keeping money in a bank account and charging its Libyan "client" nearly $10,000,000 a year in fees as if it were being "managed."

131.     Palladyne's so-called "Man-and-Machine investment process" – much vaunted to Friedman by Radujko in the spring --was also critically flawed. The model used data that had not been updated for months: an unacceptable latency by industry standards.

132.     And finally, Abudher misrepresented the origin and development of the model and, in fact, instructed an employee to remove all references to the original (and actual) author from the software – it had been misappropriated from a third party and was largely a trading model developed in 1998 and in serious need of updates.

133.     Contrary to what Rajudko had told him, there was – literally -- no "investment management department" and there were no portfolio managers or traders within the so-called department. The "investment management department" consisted of a single employee in his 20s (who had been promoted internally from an unrelated operations function) who had no experience trading or managing investment portfolios.

134.     Defendant Yeo, the so-called "Chief of Strategy," had no investment background; her experience prior to Palladyne had been in online marketing for a

wireless telecommunications company. Yeo's current "LinkedIn " profile does not even pretend to even nominal investment skills, let alone those necessary to managing funds for the sort of clients Palladyne pretended to represent. Her profile further represents that she was initially hired into Palladyne as "Director, Private Equity," even though she had no professional experience related to private equity or any other investment products or services).

135.    By all accounts, Yeo's senior position in the company was the result of an inappropriate (and unsuccessfully concealed) personal relationship with Abudher.

136.    The conflict between Yeo's intimate relationship and another similar relationship that Abudher simultaneously maintained with another staff member created serious tension and communication problems. Because Yeo was Friedman's most senior report, the Yeo-Abudher relationship precluded Friedman from discussing his concerns on a confidential basis.

137.    To get its "fair share" of the Libyan regime fraud that it facilitated, Palladyne was engaged in the unethical fee practices characteristic of money launderers: (a) charging "fees on fees," (b) charging fees at an effective rate ranging from 2.5% to 3.8% (when the industry standard was generally 0.10% to 0.55% for the type of clients Palladyne pretended to serve), (c) charging fees in excess of 3.8% on more than $250,000,000 that was being held in cash (and therefore requiring no management), and (d) charging fees on the more than $450,000,000 of other assets that had been frozen under the Ghaddafi regime sanctions – funds that could not be legally managed even if Palladyne had had the competence to do so.

138.    Palladyne was losing executive talent rapidly and was a cauldron of

morale problems – vital facts that the SThree defendants knew but failed to disclose: the Chief Technology Officer as well as the Product Manager and Corporate Program Manager resigned just days before Friedman arrived; the prior Chief Technology Officer and Chief Investment Officer had left the year earlier (as had the subsequent Chief Investment Officer, one year earlier; and the Chief R&D Officer – defendant Tischenko, was plotting to depart and abscond with the firm's limited intellectual property.

139.    SThree Group was aware of, but failed to disclose, the reasons for those departures or the serious morale problems that had ensued.

140.    Other recent departures had included the preceding Chief Research and Development Officer, and the Chief Operating Officer.

141.    The tally of departures left virtually none of the minimum human capital required to pretend to status as a legitimate asset management company.

142.    The talent exodus also necessitated the creation of another fraudulent scheme: because Palladyne lacked the skilled personnel, the trading models and most importantly, a trading track record or the other critical components needed to attract legitimate investors, it did what Ponzi schemers and other scam investment frauds have always done: it fabricated performance documentation. Its "trading performance" claims were pure fiction.

143.    Because Palladyne did not have a legitimate track record or organization that could attract professionally managed investment funds, and with its Libyan base disintegrating, Palladyne was, on information and belief, manipulating investment benchmark data (a la Bernard Madoff) in an attempt to make its poor performance history more attractive to new and unsuspecting prospective clients.

144.     Palladyne had no current or active relations with any securities brokers, nor did the firm have direct market access, electronic or otherwise, to execute trades – indispensable preconditions for a legitimate investment company.

145.     Defendant Abudher would not permit reference checks or the release of business and/or personal financial details to be examined by outsiders, so the company could not obtain credit lines, prime brokerage accounts, or handle margin trades.

146.     An apparent two-thirds of the company's management fees were paid to a single offshore "intermediary" with no apparent link to the company (but believed to be Abudher's and Yeo's method of concealing income from the Dutch tax authorities, as well as Abudher's method for getting kickbacks to his father-in-law), lending fodder to the rumor of illegal activities, and contradicting Abudher's claim that all asset management was done in-house.

### The Goldman Sachs Bribe Investigation and The Libyan Investment Authority Corruption Investigation

147.     As volatile as was the situation with Palladyne's base in the Ghaddafi regime, Friedman learned some equally distressing news: Palladyne was put on notice that Goldman Sachs was under investigation by the U.S. Justice Department and the Securities & Exchange Commission enforcement staff for violations of the Foreign Corrupt Practices Act ("FCPA").

148.     The investigation of Goldman related to its alleged attempt to launder a bribe to Libya through Palladyne.

149.     As allegedly sophisticated recruiters with substantial ongoing business relations with Palladyne, whose website boasted of its "market intelligence," the SThree Group knew about this potentially major criminal investigation implicating Palladyne.

150.    Defendant Radujko knew of these serious issues from both departing and existing Palladyne executives.

151.    Despite her knowledge of this volatile and dangerous investigation implicating Palladyne in an international crime, Radujko said nothing to Friedman, nor did SThree Group management – based in London where the bribe investigation was receiving heavy press coverage --  order Radujko to cease her relationship with Palladyne.

152.    The Palladyne-Goldman bribe investigation centered on Goldman Sachs having been instructed by the Ghaddafi regime that it would have to funnel a $50,000,000 "payment" through Palladyne to help settle out more than $1.2 billion in losses that Goldman had incurred managing funds for the LIA. According to the SEC and the U.S. Department of Justice, the evidence suggested that the "payment" was a bribe that Goldman Sachs had been instructed to channel through Palladyne.

153.    Defendant Abudher was inserted directly into the Goldman-LIA dispute by his father-in-law, and Abudher immediately proceeded to propose five distinctive ways for Goldman to "make right" with the LIA, with the coincidence that under each option, Palladyne would be the asset "manager" and collect fees and payments.

154.    Because no legitimate bank, fund or investment company would partner with Palladyne, Abudher's proposals (some made directly to Lloyd Blankfein, the CEO of Goldman) were a transparent effort by his father-in-law to take a major loss for Libya and turn it into profit for the Ghanem-Abudher family.

155.    In January, 2014, the LIA sued Goldman Sachs in the Court of High Justice, Chancery Division, in London. The subject of the suits was the trades in LIA

funds by Goldman that resulted in $1,200,000,000 in losses for the LIA.

156.    The alleged bribe to be funneled through Palladyne was to show "good faith" by Goldman that it would undertake to rectify the losses.

157.    Abudher's father in law, Ghanem, supplied the totality of LIA funds handled by Goldman Sachs through the Libyan state oil company that he headed, so it was no coincidence that Abudher, who had no expertise to manage such arrangements, was put in charge of doing a deal with Godman that, on the surface, was meant to compensate the LIA for its losses, but that was, in fact, another way for Ghanem to enrich his family through his son-in-law.

158.    In addition to the SEC and US Department of Justice investigations, another inquiry was underway by the post-Ghaddafi management of  the Libyan Investment Authority ("LIA"), the previous source of $300,000,000 (slightly under half) of the Libyan funds on which Palladyne was collecting an estimated minimum of $10,000,000 a year in fees. A portion of those fees and the millions of dollars in other annual "fees" – paid to Palladyne through the so-called Palladyne Global Diversified Fund in the Cayman Islands -- were shared by Palladyne with one or more "wastas" (an Arabic term for a "connection" or "facilitator", usually for bribes and kickbacks).

159.    On information and belief, the "wasta" splitting fees with Palladyne was Abudher's father-in-law, the late Mr. Ghanem.

160.    An LIA investigation (Ghanem had fled Libya during the revolution and no longer controlled the LIA) shortly before Friedman's arrival had revealed that the LIA had been a locus of "misappropriation, misuse and misconduct of funds."

161.    Part of the investigation had included the appointment of the international

accounting firm KPMG to look into the LIA investments under the Ghaddafi regime. At the time when Palladyne had received its $300,000,000 allocation of LIA funds to "invest," the fund was managed by a friend of Saif al-Islam Ghaddafi, one of the sons of the dictator (currently in prison; his trial has been delayed by a jurisdictional conflict between Libya and the International Criminal Court in the Hague), and wanted for war crimes by the International Criminal Court).

162.    The Ghaddafi son and friend were both protégés of Ghanem, whom they had gotten to know when they were university students in Vienna and Ghanem was an executive with OPEC, the oil cartel of which Libya is a member.

163.    KPMG placed Palladyne on a short list of the "worst performing asset managers" and recommended that it be dropped. The KPMG investigation focused both on the exorbitant fees being charged by Palladyne – a classic symptom of bribe/kickback schemes through "wastas"-- as well as its poor investment results.

164.    The reason for SThree Group's ongoing deception is that the name "Palladyne" on a resume, with these serious criminal allegations spreading through the market, would have a serious negative impact on the careers of the financial service professionals being recruited by SThree and, if disclosed, would cause SThree to lose business and commissions, and frustrate Radujko and her manager from achieving their "targets."

165.    For Friedman, the undisclosed implication of Palladyne in two international scandals was a grave setback to his career prospects. As a risk manager and trader, any link to impropriety was an indelible stain on his resume and employment record.

166.    SThree knew of this risk to the candidates it was courting but said nothing.

**The Plaintiff's Dilemma and Confrontation with Management**

167.    As the alarming facts about Palladyne trickled in, Friedman became concerned that he had moved to Europe for a job that did not exist, with a corrupt organization that (a) could not get new business in an honest fashion, (b) whose assets were not being traded, and (c) much of whose client base had either been killed in the Libyan revolution, were in jail, were in exile or were under investigation for corruption.

168.    Because the opportunities Friedman left behind in the US were no longer available, Friedman attempted to stabilize his situation within the turmoil of Palladyne and to discreetly seek more legitimate employment.

169.    Under Dutch law, important rights are conferred upon new employees upon their successful passage through a so-called "probation period" of two months. Friedman's probation would expire in early February 2012 so he did what he needed to do to pass that milestone so that he could find a way out of his dilemma.

170.    Friedman could not escape the turmoil, morale problems and the reality of Palladyne – a sham organization, seemingly trying to find a way to obtain legitimate clients but lacking the executive capacity, infrastructure or performance history to do so, and therefore resorting to fabrications of investment records and resources to conceal the multiple infirmities that would keep any legitimate client from placing funds with Palladyne.

171.    During December and January of 2012, Friedman navigated the Palladyne minefield by catering to Abudher's post-Ghaddafi survival plan and trying to encourage management to develop legitimate products.

172.    Numerous of the few key remaining employees were also hoping to find an exit from Palladyne, and Friedman was hearing stories from them that had a central theme – Palladyne was a highly secretive organization with no real apparent business, no capacity to perform in the business that it advertised, with suspicious and likely illicit revenue sources and no plausible plan to emerge as a legitimate organization.

173.    Prior to the expiration of the two month probationary period, Friedman had regular meetings with defendants Abudher and Yeo and Tishchenko, during which he expressed concern about what he was hearing and about the absence of any plausible plan to engage in the aboveboard commercial activities whose risk he was purportedly hired to manage.

174.    Both Yeo and Abudher referred to the (truthful, it turned out) stories the plaintiff was hearing as "noise" and urged Friedman to "filter it out."

175.    By mid-January, Friedman escalated his expressions of concern, advising Abudher and Yeo that he was "extremely uncomfortable because the fact pattern [does] not support the conclusion that [Palladyne] aims to provide investment products and services, and that makes me EXTREMELY nervous." (emphasis in original).

176.    Friedman was urged by Yeo and Abudher to be "patient" and, at his probationary release review, they claimed that they aimed to launch legitimate products in 2013.

177.    On February 1, 2012 Abudher and Yeo informed Friedman during his end-of-probation review that he had "passed" his probationary status. But in a bizarre turn of events, just days later, immediately after Friedman had confided his concerns about Palladyne's criminal exposure to a colleague who reported the conversation to Abudher,

his relationship with Palladyne was abruptly terminated with no legally cognizable explanation given.

### The Netherlands Opens a Criminal Investigation and SThree Surreptitiously Continues to Solicit Unsuspecting Job Seekers

178.    Shortly after Friedman's departure from Palladyne, the Dutch Anti-Fraud Agency launched a formal criminal investigation of the company.

179.    On or about June 21, 2013 the Dutch Openbaar Ministerie (Public Prosecution Service) and FIOD (Fiscal Information and Investigation Service) conducted simultaneous raids on defendant Abudher's Amsterdam residence and on Palladyne's offices, during which they obtained thousands of documents and computer files.

180.    The raids were conducted on what was reported to be a "mega fraud" by Abudher and Palladyne, and widely publicized in the Dutch media because the officers conducting the raids were heavily armed, bearing crowbars and accompanied by high-tech evidence vans that were visible on the street.

181.    Notwithstanding the raids and the abundantly publicized investigation, and notwithstanding having been directly notified in writing by Friedman of the allegations in this Complaint through a Notice of Intent to Sue in August 2013, SThree Group continued to seek fees and commissions from Palladyne.

182.    Radujko, who for the previous years had openly listed Palladyne positions on the Huxley website, continued – despite her full knowledge of the U.S. bribery and the Dutch fraud investigations -- to seek job candidates for Palladyne. But because SThree had been notified by Friedman of the allegations in this Complaint, Radujko began surreptitiously transferring her Palladyne job advertisements to more neutral (non-Huxley) websites in an apparent effort to obfuscate the link to Huxley and SThree.

183.    In August, 2013 Gary Elden, the chief executive officer of SThree UK, was personally notified by Friedman of the allegations relating to his company's complicity in the Palladyne.

184.    Notwithstanding Elden's direct knowledge of the dual criminal investigations relating to Palladyne, Elden authorized SThree executives and his Netherlands-based recruiter, defendant Radujko, to continue to search for candidates to join Palladyne, knowing that the subsequent careers of any executives they recruited would be put in jeopardy through association with a criminal enterprise.

185.    Elden's authorization to proceed to solicit candidates in the face of major international fraud allegations violated the basic ethics of the recruiting business.

186.    In so doing, SThree and Radujko continued, and continue to the date of this Complaint, to solicit applicants in Connecticut and other states for positions with Palladyne with full knowledge that their future careers may be destroyed by working for a fraudulent organization. Elden, SThree Group and Radujko are thereby actively and knowingly conspiring with Palladyne.

## COUNT I:  FRAUDULENT INDUCEMENT
### (against all SThree Group and Palladyne defendants)

187.    The allegations above in paragraphs 25 through 186 are repeated and realleged.

188.    From February through October, 2011 defendants SThree, Radujko, Palladyne, Abudher, Yeo, Tischenko, Alonso and Stevens induced Friedman to join them as their Head of Risk.

189.    Because Palladyne was not the real investment company it pretended to be, on information and belief it solicited Friedman because it was attempting to create the

appearance of an investment company.

190.     Friedman was among the multiple hires being pursued by SThree in behalf of Palladyne who, combined with the fabricated trading histories and other external indicia of legitimacy, would provide Palladyne with the veneer to attract new investors to replace the access to Libyan funds that was imperiled by the fall of the Ghaddafi regime and the ensuing corruption investigations.

191.     In order to attract Friedman, the defendants made intentional, false representations about Palladyne's management capabilities, staffing, assets under management, clientele and so-called trading formulae that led Friedman to believe that it was a legitimate investment company.

192.     The defendants made those representations with knowledge that they were false and for the express purpose of causing Friedman to rely on them and to leave the United States and join them.

193.     SThree Group, which has earned substantial fees for placing high level Palladyne executives, cooperated and conspired in the falsehoods in order to maintain its highly profitable Palladyne revenue stream. Through the date of this Complaint – and notwithstanding its knowledge of the fraudulent and potentially criminal activities of Palladyne -- SThree has continued to solicit and recruit for Palladyne while concealing the truth about its operations from job candidates.

194.     The false representations, upon which Friedman reasonably relied, caused him to leave the United States and move to The Netherlands to take a job that didn't exist.

195.     The fraud that was an essential component of the inducement was

intentionally undertaken by the SThree and Palladyne defendants to induce reliance upon the fraudulent claims, all to Friedman's career, personal and financial detriment.

## COUNT II: DECLARATORY JUDGMENT:
## LACK OF CONSIDERATION, FRAUD
### (against Palladyne)

196.    The allegations set forth in paragraphs 25 through 195 are repeated and realleged.

197.    During the period from March through October, 2011, Friedman and the defendants negotiated over what – as Friedman was led to believe – was a position as Head of Risk with a corporation with the management, clientele, systems and assets represented to Friedman throughout the negotiations.

198.    Palladyne was a fraudulent enterprise.

199.    Palladyne was not a legitimate investment or asset management company: its investment performance history was falsified; it did not employ portfolio managers or traders; it lacked the access and capability to execute securities transactions; it did not have, as it claimed, a "worldwide" client base of institutional and high net worth investors; it lacked the infrastructure to manage the portfolio it claimed to have; and its investment process and models were intentionally misrepresented, critically flawed, and significantly below accepted industry standards.

200.    Palladyne was in fact was no more than a front for the defalcation, laundering and concealment of petroleum revenues controlled by defendant Abudher's father-in-law and channeled to Palladyne through his father-in-law's high position with the Ghaddafi regime.

201.    Friedman was induced to leave the United States and forego other

40

employment opportunities in reliance on the defendants' misrepresentations about Palladyne, and solely to take the position held out and described as Head of Risk.

202.    Because Palladyne had none of the essential elements of an investment company, because it had failed to register as an investment company and adviser with the Dutch AFM, and because its funds were frozen, there was no legitimate "Head of Risk" position to be filled.

203.    With Palladyne being a fraudulent racketeering enterprise, an employment position with Palladyne managing defalcated funds is against public policy and cannot constitute consideration for a promise.

204.    The material facts relating to both Palladyne and the position purportedly being offered to Friedman were at the core of both the negotiations and of the employment agreement that was signed.

205.    The material misrepresentations were made for the purpose, and with the intent, of inducing Friedman to forego other opportunities and to come to work for Palladyne.

206.    Accordingly, Palladyne failed to offer valid consideration, the contract for the so-called Head of Risk position is a nullity, Friedman was induced to work for Palladyne through fraudulent misrepresentations, and Friedman therefore asks this Court to enter a Declaratory Judgment rescinding the employment agreement for a lack of consideration and fraud.

**COUNT III: PROMISSORY ESTOPPEL**
**(against Palladyne and SThree Group)**

207.    The allegations set forth in paragraphs 25 through 206 are repeated and reolleged.

208.    The representations made by Palladyne about its business and about the Head of Risk position offered to Friedman were made for the express purpose of inducing Friedman to forego other opportunities and come to work for Palladyne.

209.    As part of that inducement, Palladyne offered a position to Friedman that would be for an initial term of two years and pay a compensation package of $575,000 in the first year with the further inducement that it would thereafter convert to a $750,000 level, and that Friedman's compensation would subsequently keep apace with what Palladyne claimed to be its peer group. In order to compete with the other opportunities Friedman was considering

210.    Friedman reasonably relied on the multiple representations made to him by Palladyne to induce him to come to work for the company.

211.    Friedman's reliance on the multiple misrepresentations by Palladyne and the individual defendants was foreseeable.

212.    Because of that inducement, and because of its fraudulent nature, Friedman has been injured through the loss of other employment opportunities as well as the loss of the promised compensation.

213.    Further, because of the serious taint of Palladyne on his resume, Friedman's career has been seriously impaired and his salary prospects for the remainder of his career have been heavily damaged in the amount of $44, 991,000.

**COUNT IV:  RACKETEERING INFLUENCED AND CORRUPT
ORGANIZATIONS ACT
(against Palladyne, Abudher, Yeo, Tischenko, Stevens and Alonso)**

214.    The allegations in paragraphs 25 through 213 are repeated and realleged.

215.    Defendant Palladyne, by and through the direction of defendants Abudher,
Yeo, Alonso, Stevens and Tishchenko, engaged in multiple criminal acts, including
securities fraud, common law fraud, money laundering, bribery, mail fraud and wire
fraud.

216.    The above constitute predicate acts of criminality under 28 U.S.C. sec.
1961.

217.    Said predicate acts were and continue to be engaged in by the defendants
through a pattern of ongoing efforts to hire legitimate investment and securities
professionals through the same deceptive means used to harm Friedman, through the
falsification of trading and investment records to induce new clients to place their funds
with Palladyne, and through the use of a fraudulent website that, through worldwide
distribution, disseminates false information about Palladyne.

218.    These ongoing, multiple acts of predicate criminality are part of a pattern
that is designed to defraud investors, future employees (more than 125 of whom have
replied to recent falsified job ads posted by SThree Group for Palladyne), banks and other
financial institutions, securities regulatory and law enforcement authorities in the United
States, The Netherlands, the European Union and elsewhere.

219.    As such and for the above reasons, Palladyne International Asset
Management BV is a racketeering enterprise within the meaning of 18 U.S.C. sec.
1961(4).

220.    Palladyne's income from its bribery facilitation, kickback and money laundering functions is and continues to be reinvested in a web of offshore entities and accounts, in violation of 18 U.S.C. sec. 1962(a).

221.    Defendant Abudher has invested profits from his racketeering activity into Palladyne to create a façade of legitimacy. His having done so has caused damage to Friedman and the other victims of his pattern of activity, all in violation of 18 U.S.C. sec. 1962(b).

222.    Defendants Abudher, Yeo, Stevens, Tishchenko and Alonso have used defendant Palladyne as a racketeering enterprise and in so doing, caused Palladyne to induce Friedman to leave his Connecticut residence and American employment opportunities for a position that did not exist and for work that did not exist, all as a part of a scheme to create the illusion of Palladyne as a legitimate company, and for the purpose of committing further acts of criminality, in violation of 18 U.S.C. sec. 1962(c).

223.    The violations of 18 U.S.C. sec. 1962(c) caused serious and irretrievable damage to Friedman's career in financial services as well as further damages to be proven at trial.

224.    Further, because of the taint of Palladyne on his resume, Friedman's career has been seriously impaired and his salary prospects for the remainder of his career have been damaged in the amount of $44,991,000.

225.    The actions identified above were undertaken by the individual defendants as part of a conspiracy in violation of 18 U.S.C. sec. 1962(d), caused further damages to Friedman in an amount to be proven at trial, and therefore damages should be trebled pursuant to 18 U.S.C. sec. 1964(c).

**COUNT V:   CONNECTICUT UNFAIR AND DECEPTIVE
TRADE PRACTICES ACT
(against the SThree defendants and Palladyne defendants)**

226.    The allegations above in paragraphs 25 through 225 are repeated and

realleged.

227.    The Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat.

sec. 42-110a *et seq.,* proscribes conduct in trade or commerce that offends public policy

or that is immoral, unscrupulous, unethical or oppressive.

228.    The acts by the named defendants in publishing and distributing materially

false information about their respective companies were expressly designed for the

purpose of deceiving potential employees, competitors, clients and regulatory authorities

in The Netherlands, the European Union and the United States.

229.    The SThree defendants and Palladyne defendants engaged in those acts for

the express purpose of unfairly competing in trade or commerce with legitimate executive

recruitment, investment/asset management and investment companies, through the use of

materially false information, to induce potential clients and key employees of their

competitors to invest with, or come to work with, Palladyne.

230.    SThree Group and Radujko, acting as Palladyne's primary recruiter,

committed these acts as Palladyne's agent and in order to compete unfairly with more

legitimate recruitment agencies.

231.    Even after having been informed by the plaintiff of the specific frauds that

they had previously failed to disclose, and notwithstanding its knowledge that the Dutch

Public Prosecution Service has opened a formal investigation of what it has characterized

as a "megafraud" at Palladyne, SThree Group and Radujko have continued to recruit innocent third parties for Palladyne employment to preclude those job candidates from obtaining work through competing recruitment agencies and asset management companies.

232.    In so doing, SThree Group and Radujko have knowingly participated in and facilitated Palladyne's fraud.

233.    Palladyne, as principal, was responsible for the acts of its agent and has conspired with SThree Group in the acts described.

234.    Because the recruitment and asset management businesses are based on individual human talent rather than tangible property, talented employees are their primary source of revenue and their primary means of competition.

235.    The recruitment of such employees by SThree Group was its primary method of earning revenues, and by engaging SThree Group, Palladyne was responsible for the acts of its agent.

236.    SThree Group and Palladyne unfairly and respectively competed for both human talent and funds to manage.

237.    In soliciting human talent from its competitors on the basis of false, fraudulent and materially deceptive practices, including the failure to disclose to persons recruited in Connecticut and elsewhere that Palladyne is a fraudulent organization and currently subject to criminal investigations in both the United States and the Netherlands, SThree engaged in conduct expressly proscribed by CUTPA.

238.    In so doing, SThree Group has seriously compromised the careers of Friedman and others similarly situated.

239.    The acts by the defendants in so doing were unethical, immoral, deceptive, fraudulent and unscrupulous.

240.    Under Conn. Gen. Stat. sec. 42-110(g)(a), this Court has authority to impose punitive damages upon the defendants for such conduct, and the plaintiff asks that this Court impose such damages under Conn. Gen. Stat. sec. 42-110(g)(a), as well as injunctive relief.

### COUNT VI:  PUNITIVE DAMAGES
#### (against the SThree Group defendants and Palladyne defendants))

241.    The allegations in paragraphs 25 through 240 are repeated and realleged.

242.    The defendants intentionally engaged in the tortious and criminal activities described above for the purpose of harming the plaintiff and their respective competitors in the executive recruitment and asset management businesses, and to use Friedman's skills to defraud others.

243.    As an incident of those activities, the named defendants lured the plaintiff to Amsterdam for a job that didn't exist.

244.    The SThree Group defendants and Palladyne are actively engaged in ongoing and current acts of fraud and deception to induce other legitimate investment professionals to join Palladyne for the same illicit purposes, and to unfairly compete for recruitment commissions and investment funds against legitimate asset management companies.

245.    Because Palladyne's primary purpose was, at all times pertinent to this complaint, the concealment and laundering of funds siphoned under false pretenses from Libyan oil revenues, its illicit activities, and others carried out by similar front companies, serve to inflate the cost of gasoline to American consumers, and facilitates

the OPEC cartel by which the prices charged for petroleum products in the United States are artificially inflated.

246.    These acts harm individuals such as the plaintiff, and also harm American consumers.

247.    Having been wrongfully deprived of lost opportunities that were foregone by SThree Group's and Palladyne's misrepresentations, and permanent harm to his career, the plaintiff requests that this Court, as punitive damages, three times his foreseeable career income losses, subject to the exact amount to be determined at trial and, in addition, to order SThree Group to disgorge and pay to Friedman all of the commission income it obtained from Palladyne.

248.    As further compensation in the form of punitive damages, the plaintiff asks that this Court enter judgment against each of the individual defendants Abudher, Yeo, Stevens, Tishchenko, Alonso and Radujko to pay to the plaintiff two years of their respective individual salaries and bonuses, based on company financial records to be produced at trial.

### COUNT VII: DECLARATORY JUDGMENT: CONFIDENTIALITY AGAINST PUBLIC POLICY
#### (against Palladyne)

249.    In clause 14.1 of the employment contract drafted by Palladyne and executed by the parties, Palladyne imposed conditions of confidentiality relating to "Any information acquired by the Employee in the context of his work relating to the business relations of the Employer, clients, business methods, confidential proprietary information or trade secrets."

250.    In clause 14.2 of that agreement, Palladyne recognized that such

conditions could not be maintained when inconsistent with any decision of a court of law: "Except as required by law, the Employee is not permitted both during the employment and afterwards, to make any information regarding the company's internal affairs available to third parties and/or disclose such in any other way if the confidential character of this information could reasonably have been known to the Employee; provided, however, that when required by applicable law or ordered by a competent court having jurisdiction over the Employer  to make such disclosures."

251.    The information disclosed in this Complaint relates to crimes, fraud and otherwise illicit activity. As such, it is against public policy to enforce such agreements. Under the laws applicable to this proceeding, including the pleading requirements relating to fraud under FRCP Rule 9(b) and this Court's specific rules relating to RICO claims, the plaintiff is required to use the information set forth above in order to fulfil this Court's pleading rules.

252.    Under Dutch law, such clauses are unlawful and against public policy when they are used to shield illicit, criminal or otherwise fraudulent activity.

253.    The plaintiff therefore asks that this court enter a Declaratory Judgment that clauses 14.1 and 14.2 of the Friedman-Palladyne employment agreement are null and void, against public policy of the United States and The Netherlands, and affirming that the plaintiff, in citing potential confidential information, is doing so consistent with Clause 14.2 by conforming to requirements by U.S. law for such disclosures in the circumstances of fraud and RICO claims.

254.    If an employment agreement was validly formed between the plaintiff and defendant Palladyne, its termination by Palladyne was stated by the latter to be for an

"urgent reason" ("*dringende redden*") proscribed by Dutch law.

255.    The so-called "urgent reason" was never explained to Friedman. On information and belief, the true urgent reason was concern by defendants Abudher, Yeo, Stevens and Tishchenko over Friedman's overtly expressed concern about the company's fraudulent façade.

256.    The termination of Friedman's contract was pretextual, retaliatory and against public policy in the United States and The Netherlands

WHEREFORE, the plaintiff asks that this Court enter judgment on all Counts for the plaintiff, as follows:

COUNT I:  Fraudulent Inducement: judgment in the amount of $44,991,000, plus interest and attorneys' fees and costs;

COUNT II:  Declaratory Judgment:  that there was a lack of consideration for the agreement reached between Friedman and defendant Palladyne, that the agreement was procured by fraud, that said agreement is null and void, and that the agreement is rescinded.

COUNT III: Promissory estoppel: judgment for Friedman in the amount of $44,991,000, plus interest and attorneys' fees and costs.

COUNT IV:  Racketeering Influenced and Corrupt Organizations Act: judgment for the benefit of the plaintiff's bargain as well as damages from harm to his career in the financial services industry: for two years of foregone salary and bonus, ($1,500,000), and loss of career ($44,991,000) trebled under 18 U.S.C. sec. 1964(c) to a total of $139,473,000, plus attorneys' fees and costs;

COUNT V:  Connecticut Unfair Trade Practices Act:  (1) $134,973,000 (three

times career income losses) for damages to Friedman's financial career, (2) judgment against SThree Group for the revenues it has received from Palladyne and (3) an injunction enjoining SThree from soliciting and/or recruiting job candidates in Connecticut.

COUNT VI:  Punitive Damages: judgment for three times Friedman's career income losses, or $134,973,000;

COUNT VII: Declaratory Judgment: a declaratory judgment that (1) the confidentiality provisions of the Friedman-Palladyne employment agreement are null and void as against public policy in the United States and The Netherlands, (2)  this legal action constitutes legitimate use of such information under Clause 14.2, and (3) the termination of Friedman's contract was and is null and void under the law of The Netherlands, as the termination was without legitimate cause, pretextual and undertaken for purposes of unlawful retaliation.

PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL COUNTS EXCEPTING COUNTS II AND VII.

DAN FRIEDMAN, Plaintiff

By:  _/s/ Alan H. Kaufman_ (ct 29258)_
Kaufman LLC
245 Park Avenue, 39th Floor
New York, New York 10167
Tel:    646.820.6550
Fax:    646.820.6558
Email: akaufman@kaufmanllc.net

Dated: March 25, 2014